**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION**

| | |
|---|---|
| ALEXIA PREDDY, individually and on behalf of all others similarly situated, | Case No.: |
| *Plaintiff,* | |
| *v.* | |
| ADT, LLC d/b/a ADT SECURITY SERVICES, a Delaware limited liability company, | |
| *Defendant.* | |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Alexia Preddy ("Plaintiff") brings this Class Action Complaint and Demand for Jury Trial against Defendant ADT, LLC d/b/a ADT Security Services ("Defendant" or "ADT"), based on its intentional and negligent tortious acts in providing security services to its customers with remote-viewing capabilities. Plaintiff alleges as follows upon personal knowledge as to herself and to her own acts and experiences, and, as to all other matters upon information and belief.

### NATURE OF THE ACTION

1.      In April of 2020, Alexia Preddy's mother received a terrifying phone call from ADT: the technician who had installed their indoor security camera system had granted himself remote access—three years prior when Ms. Preddy was a teenager—and had used that access nearly *one hundred times* to spy on her and other household members in their most private and intimate moments.

1

2.      And Ms. Preddy was not the only one. She soon found out that hundreds of households had experienced the same staggering invasion of privacy over at least a *seven-year* period. At fault for this breach of trust: ADT's unsecure and unmonitored "security" services.

3.      While ADT boasts that it has been protecting people for over 145 years and holds itself out as "#1 in smart home security," it failed to even secure its own systems from massive and ongoing intrusions into its customers' private lives.

4.      ADT failed to provide the security services its customers relied on by leaving large vulnerabilities in the ADT Pulse application and, as a result, compromised the safety and security of its customers' homes and family members. The ADT vulnerability allowed any one of its technicians to grant themselves (or for them to grant anyone else for that matter) access to a customer's ADT Pulse application and control every aspect of the customers' home security systems—including surreptitiously opening locks and viewing security camera footage.

5.      In a frantic effort to mitigate and hide its actions, ADT began a campaign to call all affected account holders and secure a release and confidentially agreement in exchange for a monetary payment representing a fraction of the value of their claims. This effort, directed by lawyers but carried out by customer service representatives, failed to determine whether individuals were represented by counsel, and attempted to mislead them into believing that the release would cover account holders and non-account holders in the household alike.

6.      Beyond the now-known technician who accessed Plaintiff's home, potentially countless other unknown individuals have been accessing customer's ADT Pulse accounts and surreptitiously viewing their camera footage, for years, all around the country.

7.      The mental and emotional impact this revelation has had on every person receiving these calls from ADT is immeasurable. Moments once believed to be private and

2

inside the sanctity of the home are now voyeuristic entertainment for a third party. And worse, those moments could have been captured, shared with others, or even posted to the internet. ADT's failure to protect its customers irreparably destroyed their sense of security, safety, intimacy, and well-being.

## PARTIES

8.      Plaintiff Alexia Preddy is a natural person and a citizen of the State of Texas.

9.      Defendant ADT, LLC is a limited liability company organized and existing under the laws of Delaware with its principal place of business located at 1501 Yamato Road, Boca Raton, Florida 33431.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because (i) at least one member of the Class is a citizen of a different state than the Defendant, (ii) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (iii) none of the exceptions under that subsection apply in this action.

11.      This Court has personal jurisdiction over Defendant because Defendant conducts business in Florida and has its headquarters in this District.

12.      Venue is proper pursuant to 28 U.S.C. § 1391(b) because Defendant maintains its headquarters and conducts significant business in this District.

## COMMON FACTUAL ALLEGATIONS

### I.      *ADT Promises Safety and Security to Consumers.*

13.      ADT is a home security company that touts its longstanding expertise in security, and claims to have been providing security services since the 19th century. According to ADT, it has "been helping protect homes longer than any other company in the business." ADT provides

3

residential security systems and monitoring plans that purportedly "protect what matters most in your life." In short, ADT promises that it is "fully committed to your security."[1]

14.     ADT markets and sells a comprehensive security system package that includes the hardware necessary to operate a home security system, the monitoring services that detect home intrusions and alert the police, and the security system installation.

15.     ADT offers various tiers of its home security systems at different price points. The basic tier, for example, features security monitoring equipment with 24/7 alarm monitoring while the highest tier home security package includes various convenience and home automation features.

16.     One of the highest tier home security packages is ADT Pulse. ADT Pulse allows consumers to "check on your home - even if you're away" by giving them remote access to control their home security system from a mobile application or a web browser portal. Specifically, consumers can arm and disarm their home security systems, remotely lock and unlock doors, view live camera footage, and control various smart home devices like a thermostat and lights. *See* Figure 1, showing a screenshot of ADT's marketing materials for ADT Pulse.[2]

---

[1]     ADT Services | In-Home Consultation, Installation, Repairs, Customer Support, https://www.adt.com/services (last visited May 7, 2020).

[2]     ADT Pulse® | Official ADT Smart Home Automation System, https://www.adt.com/pulse (last visited May 7, 2020).



(**Figure 1.**)

17.     Consumers must purchase various smart devices from ADT to reap the benefits of the ADT Pulse service and all the advertised remote accessibility features. ADT touts that its smart home features are not only more convenient to consumers, but they provide "smarter security." For example, ADT claims that the purchase of its smart locks for use with the ADT Pulse system will result in a "whole new level of security and convenience…." as shown in Figure 2.

More convenience.
Smarter security.

Smart door locks add a whole new level of
security and convenience to a smart ADT
security system, allowing you to easily let
people in – or keep them out – remotely.

(**Figure 2.**)

5

18.     Most importantly, ADT encourages consumers to purchase video cameras for both outdoor and indoor use to "keep an eye on the things you value most."[3] The indoor cameras, according to ADT, are specifically intended to "check in on your kids" and can be set up to stream and capture video clips of events "like when your kids get home from school."[4]

19.     Consumers use the ADT Pulse mobile application to "check any or all of your ADT home security cameras" and to "look in on your family and your pets any time with live-streaming video." Furthermore, consumers are able view stored video clips from their security cameras on their phones via the ADT Pulse mobile application.[5]

20.     To use the ADT Pulse smart home features—like remotely viewing security camera footage, disarming a security system, or unlocking smart locks—consumers must login to the ADT Pulse mobile application or the ADT Pulse web browser portal by using their username and password. Anyone with valid login credentials, like a family member, can access and control the security system remotely.

21.     In order for the ADT Pulse system to function correctly, an ADT technician needs to perform the system installation and configuration.

22.     Each new security system installation comes with a "worry-free professional installation" where "high-trained ADT technicians will set-up your ADT security system so you don't have to."[6] ADT technicians will also test the security system and assist the consumer in

---

[3]     Wireless Home Security Cameras & Video Surveillance Cameras | ADT, https://www.adt.com/security-cameras (last visited May 7, 2020).

[4]     Shop ADT® Indoor Home Security Cameras | ADT, https://www.adt.com/indoor-security-camera (last visited May 7, 2020).

[5]     *Supra* note 3.

[6]     ADT® | Compare Home Security System Packages | 2020, https://www.adt.com/compare (last visited May 7, 2020)

6

connecting their smart phone to the ADT security system for use with ADT Pulse, as shown in Figure 3.



(**Figure 3.**)

23.     ADT further promotes its security services by stating that its technicians are what sets it apart from the competitors in being able to earn its customers' trust and protect the most important people in their lives. According to its website: "Our people are dedicated to taking care of the people and property you value most in your life. Our customers trust us to help protect those things that cannot be replaced." *See* Figure 4, showing a screenshot from ADT's website.[7]

---

[7]     Why ADT has the Best Home Security and Customer Service | ADT, https://www.adt.com/security-benefits (last visited May 7, 2020).

## Our people set us apart

Our people are dedicated to taking care of the people and property you value most in your life. Our customers trust us to help protect those things that cannot be replaced.

(**Figure 4.**)

II.     ***ADT Failed to Detect a Seven-Year-Long Breach of its Systems That, at the Very Least, Resulted in an ADT Employee Improperly Accessing Customers' Accounts.***

24.     Unfortunately for all of ADT's Pulse customers, a vulnerability in the Pulse security system completely obliterates all of ADT's promises of security and protection.

25.     On or around April 24, 2020, ADT began to contact some of its customers to inform them that a vulnerability in the ADT Pulse system had allowed unauthorized users to access customers' ADT Pulse accounts as if they were a regular user. In other words, an unauthorized user could remotely arm and disarm security systems, access smart home devices, and view security camera footage, including footage from indoor cameras designed to, among other things, protect customers' children.

26.     In fact, ADT's investigation revealed that at least one ADT employee in the Dallas-Fort Worth Texas area, named Telesforo Aviles, had access to more than *200 different customers'* ADT Pulse accounts for *the last seven years*. According to an ADT spokesperson, the ADT technician was able to add—and in fact did add—his own personal email address to customers' accounts, allowing him to remotely login to customers' accounts using his own, unauthorized credentials.

8

27.     This type of access could only occur because ADT failed to implement adequate procedures that would prevent non-household members from adding non-household email addresses. Similarly, ADT failed to monitor consumers' accounts and promptly alert them any time a new email was added to their accounts. Countless checks could have been in place to prevent or at least stop this conduct. Instead, this breach came to light only by luck and happenstance: a customer, reporting a technical issue, inadvertently revealed the unwanted third-party access. But for that event, ADT would be unaware of this invasive conduct and it would continue unabated to this day (likely expanding to new households).

28.     As such, countless other ADT technicians and/or employees could have taken advantage of ADT's lax security and granted themselves unfettered access to other customer accounts—entirely unbeknownst to both the customers and to ADT.

29.     Although ADT claims it has implemented procedures to prevent similar incidents in the future, it is already too late for an unknown number of consumers whose accounts and security camera footage have already been accessed and potentially exploited.

**FACTS SPECIFIC TO PLAINTIFF PREDDY**

30.     Ms. Preddy's household has been a long-time ADT security customer. In 2017, Ms. Preddy's mother received an offer from ADT to upgrade her account to the ADT Pulse system which included installing security cameras in their home. ADT represented to Ms. Preddy and her mother that this upgrade would enhance their personal security.

31.     Ms. Preddy, only a teenager at the time, had reservations about installing security cameras inside of the home, however. When her mother expressed those reservations to ADT, it reassured them both that the security system was perfectly safe.

9

32.     Indeed, Ms. Preddy relied on ADT's representations, including both representations by ADT representatives and ADT's representations on its website, about the ADT Pulse system's safety and security and accepted ADT's upgrade offer in September 2017.

33.     Shortly thereafter, an ADT technician installed the ADT Pulse system, including an indoor security camera with a wide-angle view inside Ms. Preddy's home.

34.     On April 24, 2020, a phone call from ADT destroyed whatever security and safety its security system promised. ADT called Ms. Preddy's mother to explain that one of its technicians had gained access to her account and had been watching her and Ms. Preddy. According to ADT, at least one of its technicians accessed her home security cameras on approximately 73 different occasions.

35.     In an email later that day, ADT Chief Customer Officer Jamie Haenggi described it as "a difficult message to hear." Difficult is, of course, woefully inadequate to truly describe Plaintiff's loss of security, loss of safety, humiliation, and anger.

36.     Based upon the cameras' wide-angle lens and placement, the ADT's employee had an opportunity to watch at least the following events:

> a.  Ms. Preddy nude;
>
> b.  Ms. Preddy in various states of undress;
>
> c.  Ms. Preddy getting ready for bed; and
>
> d.  Moments of physical intimacy.

37.     Immediately after the call, Ms. Preddy's mother disconnected the ADT camera in their home. Ms. Preddy expended significant time addressing the current and future consequences of the exposure enabled by ADT, including, but not limited to, removing ADT security hardware, and researching additional surveillance and security devices and services.

10

38.     Prior to April 24, 2020, Ms. Preddy and her mother never received any call, text, email, or notification of any kind informing them that another user was added to the ADT Pulse account or that a third-party user accessed the ADT Pulse account.

## CLASS ALLEGATIONS

39.     **Class Definition**: Plaintiff Alexia Preddy brings this action on behalf of herself and a class of similarly situated individuals defined as follows:

> All individuals in the United States who (1) reside in a household with an ADT Pulse security system, but are not the account holder; (2) where that security system was remotely accessed by an employee or agent of Defendant ADT without authorization from the account holder.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and the members of their family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated by a court of law on the merits; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

40.     **Numerosity**: The exact number of members of the Class is unknown and is not available to Plaintiff at this time, but individual joinder in this case is impracticable. The Class likely consist of hundreds of individuals. Members of the Class can be easily identified through Defendant's records.

41.     **Commonality**: There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any

11

questions that may affect individual members of the Class. Common questions for the Class include but are not limited to the following:

      a.  Whether Defendant's conduct constitutes negligence;

      b.  Whether Defendant's conduct constitutes gross negligence;

      c.  Whether Defendant's conduct constitutes an intrusion upon seclusion;

      d.  Whether Defendant's conduct constitutes negligent hiring, supervision and retention; and,

      e.  Whether Defendant's conduct constitutes intentional infliction of emotional distress.

42.    **Typicality:** Plaintiff's claims are typical of other members of the Class, in that Plaintiff and the members of the Class sustained damages arising out of Defendant's uniform wrongful conduct.

43.    **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class and have retained counsel competent and experienced in complex class actions. Plaintiff has no interest antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff.

44.    **Predominance and Superiority**: This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all parties is impracticable. The damages suffered by the individual members of the Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendant's misconduct. Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class

12

action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered, and uniformity of decisions ensured.

**FIRST CAUSE OF ACTION**
**Negligence**
**<u>(On Behalf of Plaintiff and the Class)</u>**

45.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

46.     Defendant ADT had full knowledge of the purpose for which its security cameras were being used and the sensitivity of the people and things the cameras were designed to secure and protect—that which "matters most" to their clients. Defendant also knew the types of harm that Plaintiff and the members of the Class could and would suffer if the integrity of the security system was compromised.

47.     Defendant had a duty to exercise reasonable care in ensuring that all ADT security systems were secure, safe to use, and inviolable by unauthorized parties. This duty includes, among other things, ensuring that reasonable and proper protocols and safeguards are in place so that consumers' security cameras are not easily compromised by unauthorized users.

48.     Defendant ADT, by and through its agents, employees, and independent contractors, was negligent in its acts and/or omissions by, amongst other things, allowing technicians to create authorized user accounts, and by failing to discover that its employees could make and did make themselves authorized users gaining unauthorized access to Plaintiff's home ADT Pulse system, thereby allowing surreptitious videos and images to be viewed and taken of Plaintiff in their home.

49.     Plaintiff and the members of the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew of or should have known of the inherent risks of allowing ADT cameras to be set up and used without adequate security protocols and safeguards.

50.     Defendant ADT further knew or should have known that: (1) the surreptitious recordings of Plaintiff contained private and confidential information about Plaintiff; (2) Plaintiff had a reasonable expectation of privacy in being partially and fully naked, engaging in consensual intimate activity, and having private conversations in a private home; (3) the recordings were taken without Plaintiff's knowledge or consent; (4) the surreptitious recordings would reveal private and personal things about Plaintiff which Defendant had no right or authorization to view, use, disseminate, or disclose; (5) and the viewing of these private acts and occasions constitutes a substantial violation of Plaintiff's right of privacy.

51.     Beyond ordinary negligence, Defendant ADT was grossly negligent because the acts and omissions of Defendant ADT and its employees and agents were more than momentary thoughtlessness or inadvertence. Rather the conduct, when viewed objectively from the standpoint of Defendant ADT at the time of these events, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Plaintiff. Moreover, Defendant ADT had subjective knowledge of the risk of employees gaining unauthorized access to clients cameras, but failed to disclose to Plaintiff the vulnerability of their monitoring systems and the ability of ADT employees to monitor and observe their home without their consent, and acted with conscious indifference to the rights, safety, and welfare of their clients.

52.     Defendant's own actions and inactions created a foreseeable risk of harm to Plaintiff and the members of the Class. Defendant's misconduct included, but was not limited to,

14

its failure to sell security systems with a sufficiently robust security protocols to prevent unauthorized users from gaining access to the cameras, and failing to inform Plaintiff and the members of the Class when unknown individuals added their email addresses to customer accounts.

53.     Defendant was in a position to protect against the harm suffered by Plaintiff and the members of the Class and had a duty to do so.

54.     Defendant, through its actions, unlawfully breached its duty to Plaintiff and the members of the Class by failing to ensure their cameras and set up procedures were sufficiently robust to protect against unauthorized use.

55.     As a result of Defendant's negligence, Plaintiff and the members of the Class have suffered and will continue to suffer damages and injury including, but not limited to: mental anguish and suffering in the form of anxiety, stress, loss of security, fear, loss of safety, humiliation, and anger.

56.     Further, because Defendant's acts and omissions resulted from gross negligence, exemplary damages should be awarded against Defendant in an amount to be determined by the jury in this case. Moreover, exemplary damages should be awarded without limitation, as set forth in TEX. CIV. PRAC. & REM. CODE § 41.008(c).

**SECOND CAUSE OF ACTION**
**Intrusion Upon Seclusion**
**(On Behalf of Plaintiff and the Class)**

57.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

58.     Defendant intentionally intruded upon Plaintiff's and each of the Class members' seclusion, permitting unauthorized access to their private security camera footage.

15

59.     Defendant's facilitation and failure to stop such access is highly offensive to a reasonable person as it reveals intimate private details about Plaintiff and each of the Class memers and the activities they participate in inside the privacy of their own homes.

60.     Defendant's intrusion upon the Plaintiff's and the Class members' seclusion caused Plaintiff and the Class members mental anguish and suffering in the form of anxiety, stress, loss of security, fear, loss of safety, humiliation, and anger.

### THIRD CAUSE OF ACTION
### Negligent Hiring, Supervision and Retention
### (On Behalf of Plaintiff and the Class)

61.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

62.     At all relevant times, Telesforo Aviles was ADT's employee and/or agent.

63.     Whenever in this Complaint it is alleged that Defendant did any act or thing, it is meant that each of Defendant's officers, agents, servants, employees, or representatives did such act and/or that at the time such act was done, it was done with the full authorization or ratification of the Defendant, or was done in the normal and routine course and scope of employment of each of Defendant's officers, agents, servants, employees, or representatives.

64.     ADT had the opportunity and duty to screen its employees, including Aviles, to ensure they were fit to perform the duties asked of them.

65.     ADT knew or should have known Aviles was incompetent or unfit. Nonetheless, ADT made the reckless decision to hire and retain Aviles as a technician.

66.     ADT and its agents, servants, and employees, who were at all times acting in the course and scope of their employment, were guilty of negligence toward Plaintiff. Defendant ADT is further liable for the negligent acts of their agents, servants, or employees, including

16

Aviles, under the legal doctrine of respondeat superior. At all relevant times, Aviles was an agent apparent or ostensible agent of Defendant ADT.

67.     ADT's negligence was a proximate cause of Plaintiff's and Class members' injuries and damages, including, but not limited to, Defendant ADT's negligence in:

> a. Failing to perform due diligence in contacting Aviles's prior employers;
>
> b. Failing to adequately evaluate Aviles's mental state prior to hiring;
>
> c. Any and all actions and omissions as may be proven at trial;
>
> d. Negligently hiring Aviles in a position allowing him to have access to sensitive client information;
>
> e. Negligently allowing Aviles to access sensitive client information when Defendant ADT knew, or in the exercise of ordinary care should have known, that Aviles was unfit;
>
> f. Negligently retaining Aviles in its employ in a position that provided him with access to sensitive client information;
>
> g. Negligently and inadequately supervising its employees;
>
> h. Failing to create and/or enforce safety rules, polices, and procedures governing employee conduct regarding access to clients' cameras and other sensitive information;
>
> i. Failing to warn Plaintiff of the inappropriate and substandard hiring and retention, training, and supervision of their employees; and
>
> j. Negligently allowing the ADT employee to accomplish the tort upon Plaintiff by the existence of his agency relationship with Defendant ADT.

68.     These actions and omissions of ADT singularly, or in combination with others, proximately caused damages to Plaintiff and the Class, including mental anguish and suffering in the form of anxiety, stress, loss of security, fear, loss of safety, humiliation, and anger.

**FOURTH CAUSE OF ACTION**
**Intentional Infliction of Emotional Distress**
**(On Behalf of Plaintiff and the Class)**

69.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

17

70.     At all times herein, ADT's employee acted intentionally, maliciously, and without justification, to gain unauthorized access to Plaintiff's private camera, potentially including video of Plaintiff partially and fully naked, and engaging in intimate and other private activities, when ADT's employee knew or should have known that Plaintiff would suffer severe emotional distress as a result.

71.     The conduct by ADT's employee was intentional and malicious and done for the purpose of causing, or was known by Aviles to be likely to cause, Plaintiff to suffer severe emotional distress, and was done with the wanton and reckless disregard of the consequences to Plaintiff.

72.     Defendant ADT had a duty to exercise reasonable and ordinary care and caution in and about the management, maintenance, supervision, control and operation of its systems and each of their employees, agents, and independent contractors, all to the benefit of clients and persons like Plaintiff.

73.     Defendant ADT, by and through its agents, employees, and independent contractors, was reckless in its acts and/or omissions by, amongst other things, allowing technicians to create authorized user accounts, and by failing to discover that Aviles made himself an authorized user and gained unauthorized access to Plaintiff's home camera, thereby allowing surreptitious videos and images to be viewed and taken of Plaintiff in the privacy of her home.

74.     Defendant ADT knew or should have known that: (1) the surreptitious recordings of Plaintiff contained private and confidential information about Plaintiff; (2) Plaintiff had a reasonable expectation of privacy in being partially and fully naked and engaging in consensual intimate activity, and having private conversations, in a private home; (3) the recordings were

18

taken without Plaintiff's knowledge or consent; (4) the surreptitious recordings would reveal private and personal things about Plaintiff which Defendant had no right or authorization to view, use, disseminate, or disclose; (5) and the viewing of these private acts and occasions constitutes a substantial and outrageous violation of Plaintiff's right to privacy.

75.     These acts were done intentionally or with a conscious and/or reckless disregard of Plaintiff's rights, and with the intent to vex, injure or annoy, such as to constitute oppression, fraud or malice. ADT acted outrageously and beyond all reasonable bounds of decency, and intentionally inflicted severe emotional distress upon Plaintiff, to her detriment.

76.     As a direct and proximate result of ADT's aforementioned acts and omissions, Plaintiff suffered, emotional injury, mental damage, loss, harm, anxiety, embarrassment, humiliation, shame, and severe emotional distress in an amount subject to proof. These damages are continuing in nature and will be suffered in the future.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Alexia Preddy, individually and on behalf of the Class of similarly situated individuals, prays for the following relief:

A.     Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff as the representative of the Class, and appointing her counsel as class counsel;

B.     Declaring that Defendant's actions, as set out above constitute a negligence, intrusion upon seclusion, negligent hiring, supervision and retention, and intentional infliction of emotional distress;

C.     Awarding damages, including statutory, exemplary and punitive damages where applicable;

D.      Awarding Plaintiff and the Class their reasonable litigation expenses and attorneys' fees;

E.      Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent allowable;

F.      Awarding such other injunctive and declaratory relief as is necessary to protect the interests of Plaintiff and the Class; and

G.      Awarding such other and further relief as the Court deems reasonable and just.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

**ALEXIA PREDDY**, individually and on behalf of all others similarly situated,

Dated: May 18, 2020                    By: */s/ Karina D. Rodrigues*
                                              Karina D. Rodrigues


Karina D. Rodrigues (Florida Bar No. 112713)
kdr@kulaw.com
KELLEY | UUSTAL, PLC


500 North Federal Highway, Suite 200
Fort Lauderdale, Florida 33301
Tel: (954) 522-6601
Fax: (954) 522-6608

Jay Edelson*
jedelson@edelson.com
Benjamin H. Richman*
brichman@edelson.com
J. Eli Wade-Scott*
ewadescott@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654

20

Tel: 312.589.6370
Fax: 312.589.6378

Matthew R. McCarley*
mmccarley@fnlawfirm.com
N. Majed Nachawati*
mn@fnlawfirm.com
C. Bryan Fears*
fears@fnlawfirm.com
S. Ann Saucer*
asaucer@fnlawfirm.com
Misty A. Farris*
mfarris@fnlawfirm.com
FEARS NACHAWATI, PLLC
5473 Blair Road
Dallas, Texas 75231
Tel: 214.890.0711
Fax: 214.890.0712

Amy M. Carter*
amy@clgtrial.com
Heather V. Davis*
hdavis@clgtrial.com
**CARTER LAW GROUP, P.C.**
5473 Blair Rd.
Dallas, Texas 75231
Telephone: (214) 390-4173

*Pro Hac Vice Pending*